UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 09-CR-14-GFVT |
| | ) | |
| v. | ) | RECOMMENDED |
| | ) | DISPOSITION |
| DAMON LANDOR, | ) | |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

The Court considers a Motion to Suppress filed by Defendant Damon Landor.[1] *See* DE #21

(Motion). Landor, a federal inmate, faces an indictment charging illegal weapon possession in

violation of 18 U.S.C. § 1791. *See* DE #1 (Indictment). Defendant, through counsel, moved to

suppress statements he purportedly made to Bureau of Prisons (BOP) Lieutenant Hardin and two

prison counselors (Dr. Willard and Dr. Reinwald) regarding the weapon. *See* DE #21 (Motion). The

Court held a lengthy evidentiary hearing, *see* DE #32 (Minute Entry I); DE #33 (Tr. I), and

subsequently permitted counsel to file supplemental briefs. *See* DE #35 (Defendant Brief I); DE #39

(U.S. Brief I). The Court then held a second evidentiary hearing focused solely on applicability of

the psychiatrist/patient privilege. *See* DE #43 (Minute Entry II); DE #45 (Tr. II). Following that

hearing, both parties submitted further supplemental briefing. *See* DE #46 (U.S. Brief II); DE #48

(Defendant Brief II).

---

[1]
      Upon Defendant's request, Landor's initially-appointed CJA counsel filed a single-page
motion to suppress. *See* DE #9. Counsel also filed a motion to withdraw. *See* DE #10.
Subsequently, Defendant filed a pro se motion to suppress. *See* DE #11. Ultimately, the Court
granted counsel's motion to withdraw and appointed a new lawyer. *See* DE #17. Defendant,
through new counsel, then filed the instant motion to suppress (DE #21) and notice of withdrawal
of the two prior suppression motions. *See* DE #22.

Having reviewed the briefs and arguments submitted by counsel, and the full and expansive record, the Court recommends that the District Court GRANT the motion in its entirety. *Miranda* requires suppression of the statements made to Lt. Hardin, and the federal psychotherapist-patient privilege bars admission of the other subject statements.

## I. Background Information

At United States Penitentiary McCreary, on January 6, 2009, staff conducted a routine search of Defendant Damon Landor's cell, which he shared with one other inmate. *See* DE #33 (Tr. I) at 54. During that search, staff uncovered a homemade weapon, specifically a "solid steel" blade with a leather-wrapped handle. *See id.* at 8; *id.* at 11 (Lt. Hardin noting that the blade was cut out of the steel from a bunk); *id.* at 52 (Lt. Hardin describing blade as "a bone-crusher"). Staff confiscated the weapon, undertook a thorough search of the cell, and contacted Lieutenant Timothy Hardin, who was the activities lieutenant that day. *See id.* at 6.

After hearing a description of the weapon, Lt. Hardin ordered several officers to transport Landor to the lieutenant's office. *See id.* Upon Defendant's arrival, Lt. Hardin, without providing *Miranda* warnings, began questioning him about the weapon, allegedly found in Landor's unlocked locker. *See id.* at 16 (Lt. Hardin testifying that he did not give *Miranda* warnings to Landor); *id.* at 12 (types of questions asked); DE #21-2 (Defense Exhibit 1) (Hardin memo: "I questioned inmate Landor . . ."). At the time of questioning, Defendant was not physically restrained; however, he was not free to leave. *See* DE #33 (Tr. I) at 15. Defendant answered some of Lt. Hardin's questions and allegedly claimed ownership of and accurately described the weapon in question. *See id.* at 44 ("He said, 'The weapon is mine.' . . . He described the weapon in detail, what it looked like, the wrapping that was around it, the color of the lanyard . . ."). Landor did not respond to Lt. Hardin's intent-

based questions. *See id.* ("I asked him what his intentions were with that weapon, and got no response.").

Based upon the results of the interrogation, Lt. Hardin transferred Defendant to the secure Special Housing Unit (SHU). *See id.* While in a holding cell awaiting processing, Landor asked to speak with someone from the psychology department. At that time, BOP psychologists Dr. Mary Willard and Dr. Adam Reinwald were present in the SHU as part of their routine rounds.[2] A staff member informed Dr. Willard and Dr. Reinwald of Defendant's request, and they approached him at the holding cell. *See id.* at 63. Aside from Landor, Dr. Willard, and Dr. Reinwald, no other persons were involved in the discussion. Neither psychologist warned Defendant of any limitations on confidentiality relative to the interaction. *See id.* at 118.

Dr. Willard and Dr. Reinwald greeted Landor and queried him about the request to meet. In response, Defendant, who seemed angry and agitated, allegedly told them about the previously-discovered knife and his intent to use it to kill a counselor who Landor said propositioned him in a sexual manner. *See id.* at 63. The conversation apparently ended shortly thereafter. Later that day, Dr. Willard and Dr. Reinwald reported the content of their conversation with Landor to BOP Special Investigative Services (SIS) and submitted brief written statements. *See* DE #21-4 (Defense Exhibit 3) (Willard memo); DE #21-3 (Defense Exhibit 2) (Reinwald memo).

On February 26, 2009, Defendant was indicted for knowing possession of "a prohibited object, that is, a metal blade, designed and intended to be used as a weapon, all in violation of 18 U.S.C. § 1791(a)(2)." *See* DE #1 (Indictment). Through counsel, Landor filed a motion to suppress

---

[2]

Dr. Willard is a staff psychologist at USP McCreary. *See* DE #33 (Tr. I) at 61. Dr. Reinwald is a staff psychologist and Drug Abuse Program (DAP) coordinator at USP McCreary. *See id.* at 104.

statements made to Lt. Hardin, Dr. Willard, and Dr. Reinwald.  The Court conducted an evidentiary hearing on May 22, 2009.  The Court heard testimony from Lt. Hardin as to the January 6 events, including his opinions on the rarity, sophistication, and dangerousness of the weapon at issue and his concerns, at the time of the incident, for the safety of the facility.  Both Dr. Willard and Dr. Reinwald testified about their conversation with Landor and their treatment-oriented, rather than investigative, role within USP McCreary. Special Investigative Agent James Huff also testified and provided information about institutional safety, the investigative role of Lt. Hardin vis-a-vis SIS, and the uniqueness of the discovered weapon.  The parties then submitted post-hearing briefs.

Even though Defendant's motion asserted only a *Miranda* violation as justification for suppression, testimony and argument at the evidentiary hearing raised potential application of the psychotherapist-patient privilege relative to Landor's interaction with Dr. Willard and Dr. Reinwald. After receiving supplemental briefs from both parties, the Court, at the request of the United States, held a second evidentiary hearing that focused solely on the applicability of that privilege.  Dr. Willard and Dr. Reinwald both again testified about their conversation with Landor, the limits of confidentiality, and their duties/role within USP McCreary.  Following the second hearing, the Court again permitted the parties to file further briefing.

In short, Defendant argues his statements to Lt. Hardin should be suppressed because Hardin interrogated him in violation of *Miranda*.  Defendant also asserts that the public safety exception to *Miranda* (per *New York v. Quarles*, 104 S. Ct. 2626 (1984)) does not apply on the facts of his case because staff had already seized the subject weapon prior to the interrogation.  Finally, Landor asks the Court to suppress statements made to Dr. Willard and Dr. Reinwald as privileged.

In opposition, the United States asserts that the unique prison environment favors application

4

of the *Quarles* public safety exception to the facts of this case. Additionally, the United States argues that Landor's statements to Dr. Willard and Dr. Reinwald were neither confidential nor made in the course of treatment, thereby making inapplicable the claimed psychotherapist-patient privilege.

## II. *Miranda* Analysis

Defendant seeks to suppress unwarned statements he made to Lt. Hardin immediately following the discovery and confiscation of the weapon in Landor's cell. *See* DE #21 (Motion). The United States concedes that Lt. Hardin custodially interrogated Defendant. *See* DE #39 (U.S. Brief I) at 2 n.1; DE #14 (U.S. Response to DE ## 9 & 11) at 3-4. Additionally, the record reflects, without objection from either party, that Lt. Hardin failed to administer *Miranda* warnings prior to questioning Landor. *See* DE #33 (Tr. I) at 16. However, the United States argues that the Court nevertheless should admit Landor's unwarned statements under the public safety exception to *Miranda*. *See* DE #39 (U.S. Brief I) at 2-5. As formulated in this Circuit, however, the public safety exception does not apply to the facts of this case.

### a. *Miranda* Application

The Self-Incrimination Clause of the Fifth Amendment guarantees that an individual may not be "compelled in any criminal case to be a witness against himself." *See* U.S. CONST. amend. V.[3] In order to protect this right, the United States Supreme Court requires an officer, prior to engaging in custodial interrogation,

> [to] warn the individual in custody that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence

---

[3]

This right restricts the actions of states, as well as the federal government. *See Malloy v. Hogan*, 84 S. Ct. 1489, 1492 (1964).

of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*See Miranda v. Arizona*, 86 S. Ct. 1602, 1630 (1966). Without the requisite warning, any statement made will not be admissible in a subsequent trial. *See id.* ("[U]nless and until such warnings . . . are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used[.]").

For purposes of *Miranda*, a person is "in custody" when, under the circumstances surrounding the interrogation, the person was under "'formal arrest or [experienced] restraint on freedom of movement' of the degree associated with a formal arrest." *See California v. Beheler*, 103 S. Ct. 3517, 3520 (1983) (quoting *Oregon v. Mathiason*, 97 S. Ct. 711, 714 (1977) (per curiam)). When evaluating a custody inquiry,[4] courts focus on "the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *See Stansbury v. California*, 114 S. Ct. 1526, 1529 (1994) (per curiam). Thus, even if the officer discloses to the interrogated person his views "concerning the nature of an interrogation . . . [or] the potential culpability of the individual being questioned," such views are relevant to a custody determination only to the extent that they "would have affected how a reasonable person in that position would perceive his or her freedom to leave." *See id.* at 1530.

The Supreme Court defines "interrogation" to include both express "questioning initiated by law enforcement officers," *see Miranda*, 86 S. Ct. at 1612, and "any words or actions on the part

---

[4] A defendant bears the burden of establishing that a scenario invoked *Miranda's* obligations. *See United States v. Donaldson*, 493 F. Supp. 2d 998, 1003 (S.D. Ohio 2006). Interrogation – police questioning or conduct functionally designed to elicit a response – also must exist for *Miranda* to apply. *See, e.g., United States v. Blackmon*, No. 96-6701, 1998 WL 109992, at *2 (6th Cir. Mar. 3, 1998) (unpublished). Once *Miranda* applies, the Government must prove compliance and valid waiver. *See United States v. Thomas*, 38 F. App'x 198, 202 (6th Cir. 2002).

of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response . . ." *See Rhode Island v. Innis*, 100 S. Ct. 1682, 1690-91 (1980); *Arizona v. Mauro*, 107 S. Ct. 1931, 1935 (1987) (noting that the Court, in *Innis*, "clarified" the *Miranda* definition of "interrogation");*United States v. Soto*, 953 F.2d 263, 264-55 (6th Cir. 1992) (citing the *Innis* definition of interrogation in the 5th Amendment context).

*Miranda* applies in the prison setting. *See Mathis v. United States*, 88 S. Ct. 1503, 1504 (1968). However, corrections officers obviously need not administer warnings every time they speak with an inmate; as with their non-incarcerated counterparts, inmates are entitled to *Miranda* warnings only if subjected to custodial interrogation. *See Cervantes v. Walker*, 589 F.2d 424, 427 (9th Cir. 1978) ("[W]hile Mathis may have narrowed the range of possible situations in which on-the-scene questioning may take place in a prison, we find in Mathis no express intent to eliminate such questioning entirely merely by virtue of the interviewee's prisoner status."). In place of the normal "freedom of movement" standard, courts use a "restriction of movement" standard to determine if a prisoner was in custody; thus, courts "look to some act which places *further limitations* on the prisoner." *See United States v. Cofield*, No. 91-5957, 1992 WL 78105, at *2 (6th Cir. Apr. 17, 1992) (unpublished) (emphasis added); *see also United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985) (adopting the *Cervantes* determination of "whether the inmate was subjected to more than the usual restraint on a prisoner's liberty to depart").

Since restriction of movement is a "relative concept," courts utilize four factors to determine if "some act . . . place[d] further limitations on the prisoner." *See Cervantes*, 589 F.2d at 428; *see also Garcia v. Singletary*, 13 F.3d 1487, 1492 (11th Cir. 1994) (examining "the totality of the circumstances surrounding the alleged interrogation" to ascertain the existence of an "additional

restraint"). The four factors consist of "the language used to summon the individual, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the additional pressure exerted to detain him." *See Cervantes*, 589 F.2d at 428; *see also Cofield*, 1992 WL 78105, at *2-3 (articulating and applying the *Cervantes* factors). Using this test, courts weigh the evidence "to determine whether a reasonable person would believe there had been a restriction of his freedom over and above that in his normal prisoner setting." *See Cervantes*, 589 F.2d at 428.

As previously noted, the United States concedes that the encounter between Defendant and Lt. Hardin constituted custodial interrogation, thereby presumptively requiring *Miranda* warnings. *See* DE #39 (U.S. Brief I) at 2 n.1; DE #14 (U.S. Response to DE ## 9 &11) at 3-4. The record supports this concession. After a housing unit officer discovered a weapon in Defendant's cell, several compound officers ushered Landor to the lieutenant's office at the request of Lt. Hardin. *See* DE #33 (Tr. I) at 6-7. Upon arrival, Landor, although unrestrained, "was not free to leave . . ." *See id.* at 16. Without first providing *Miranda* warnings, *see id.*, Lt. Hardin proceeded to question Landor about the weapon, "specifically to determine if he [Landor] had more weapons, if there was a threat . . . [and] [b]asically *to determine if the weapon was his or was . . . not his.*" *See id.* at 6 (emphasis added); *id.* at 12-13 ("I [Lt. Hardin] was just trying to determine did the weapon belong to him, whose weapon was it, what his intent was."). Taken together, these facts reflect both "restriction of movement" and questioning designed "to elicit an incriminating response"; thus, Landor was subject to custodial interrogation in his interaction with Lt. Hardin.

### b. Public Safety Exception to *Miranda*

Not every custodial interrogation requires the *Miranda* warning. The existence of a threat

8

to public safety may, depending on the circumstances, afford an exception. *See New York v. Quarles*, 104 S. Ct. 2626 (1984). In *Quarles*, the Supreme Court recognized an exception allowing police officers to ask "questions necessary to secure their own safety or the safety of the public" without first reading *Miranda* warnings to a person in custody. *See id.* at 2633; *id.* at 2631-2632 ("[W]e do not believe that the doctrinal underpinnings of Miranda require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety."). The scenario arises when an officer has "a reasonable belief based on articulable facts that [he or she is] in danger." *See United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001) ("[T]he reasonableness test is objective, not subjective."). However, the public safety exception does not apply if an officer asks "questions designed solely to elicit testimonial evidence from a suspect," *see Quarles*, 104 S. Ct. at 2633, or questions that are "clearly investigatory." *See id.* at n.8.

As the *Quarles* Court noted in several instances, the public safety exception is narrow. *See, e.g., id.* at 2631 ("We hold that *on these facts* there is a 'public safety' exception to . . . Miranda[.]") (emphasis added); *id.* at 2632 (noting that the Court "recogniz[ed] a *narrow* exception to the Miranda rule in this case") (emphasis added); *id.* at 2630 n.3 (describing holding as one of "limited circumstances" where *Miranda* would not apply); *see also United States v. Liddell*, 517 F.3d 1007, 1010 (8th Cir. 2008) (Gruender, J., concurring) (writing separately out of "concern that [8th Circuit] decisions applying the public safety exception to *Miranda* have strayed from the Supreme Court's tethering of the exception to the existence of exigent circumstances"). Significantly, the Sixth Circuit has *strictly* confined the exception, stating that an officer,

> to have a reasonable belief that he is in danger, . . . must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it. The

9

public safety exception applies *if and only if* both of those two conditions are satisfied and no other context-specific evidence rebuts the inference that the officer reasonably could have perceived a threat to public safety.

*See United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007) (emphasis added).

Thus, in this Circuit, *Quarles* applies only to an exigency involving a stray or suspected weapon. *See Liddell*, 517 F.3d at 1013 (noting strict rule in Sixth Circuit); *United States v. Williams*, 272 F. App'x 473, 477 (6th Cir. 2008) (describing 2007 *Williams* case as "set[ting] forth the standard the government must satisfy in order . . . [to use] the *Quarles* public safety exception."); *see also United States v. Martinez*, 406 F.3d 1160, 1165 (9th Cir. 2005) ("In order for the public safety exception to apply, there must have been 'an objectively reasonable need to protect the police or the public from an immediate danger associated with [a] weapon.'") (citation omitted); *United States v. Blackmon*, No. 96-6701, 1998 WL 109992, at *2-3 (6th Cir. Mar. 3, 1998) (unpublished) (jail case discussing *Quarles* as applying to "the location of a gun").

Despite Lt. Hardin's legitimate safety concerns, the public safety exception, as defined in *Quarles* and *Williams*, does not apply under the facts of this case. Specifically, the second condition articulated in *Williams* – "reason to believe . . . that someone other than police might gain access to that weapon and inflict harm with it" – is absent. According to Lt. Hardin's testimony, a housing unit officer notified him about a weapon discovered in Defendant's cell and described the weapon in detail. *See* DE #33 (Tr. I) at 6-7. "Immediately" following notification, Lt. Hardin ordered several compound officers to escort Landor to the lieutenant's office for questioning. *See id.* at 7. At the time of questioning, the officers had already seized the weapon, *see id.* at 60, and had completed "an intense top to bottom search of the [Landor's] cell." *See id.* at 54; *id.* (Lt. Hardin noting, "General practice, if they find something to that extent, then they generally search more thoroughly the rest of the search."); *id.* (Lt. Hardin agreeing that the "search [would] have occurred

immediately following discovery of the contraband").  Because Lt. Hardin questioned Landor, in custody, after the officers had seized the discovered weapon and conducted an "intense" search that yielded no further contraband, the public safety exception, per *Williams*, simply does not apply.

In its supplemental brief, the United States acknowledges the *Williams* limitation, but argues that the underlying "rationale of the case supports a finding that the public safety exception should also extend to facts at issue in this case."  *See* DE #39 (U.S. Brief I) at 2.  Specifically, the United States points to the list of *Williams* factors, to include "the known history and characteristics of the suspect, the known facts and circumstances of the alleged crime, and the facts and circumstances confronted by the officer when he undertakes the arrest," *see Williams*, 483 F.3d at 428, described as encompassing an evaluation of the reasonableness of an officer's belief of danger.  *See* DE #39 (U.S. Brief I) at 2.  Using these factors, the United States argues that the sophistication of the weapon, the premeditation and planning necessary to construct such a weapon, and Lt. Hardin's experience-based awareness "that inmates often have accomplices or multiple weapons when planned, premeditated attacks occur" favor application of the public safety exception in this case. *See id.* at 3.

The Court is not persuaded that it can extend the narrow public safety exception in this manner.  Despite the fact that the Sixth Circuit articulated the cited series of factors, the Court, in the very next sentence, stated that "[f]or an officer to have a reasonable belief that he is in danger, *at minimum*, he must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon . . ."  *See Williams*, 483 F.3d at 428 (emphasis added).  The decision also noted that an officer's reasonable belief must be "'based on *articulable facts* that [he or she is] in danger.'" *See id.* (quoting *Talley*, 275 F.3d at 563) (emphasis added).

11

*Williams* plainly limits *Quarles* to an exigency involving weapon location. Here, BOP officials not only had Landor in custody, but they also had located the subject knife and performed a top to bottom, intensive search of Landor's cell. Additionally, Lt. Hardin's experienced-based concerns[5] regarding the possibility that Landor possessed other, still-hidden weapons or had recruited an accomplice, while legitimate in the prison environment, cannot be accurately characterized as "articulable facts" sufficient to excuse compliance with *Miranda*. SIA Huff directly conceded that "there was no evidence of any other weapon being in existence." *See* DE #33 (Tr. I) at 148 (stating "That's my understanding" in response to question). Permitting a generic expectation of associated criminality to fit within *Quarles* soon would subsume *Miranda* altogether. Moreover, a review of Lt. Hardin's testimony reveals general observations and assumptions rather than specific references to the circumstances underlying the present case. *See, e.g.*, DE #33 (Tr. I) at 11 ("[W]hen we find one weapon we *always assume* that the very likelihood is that they have more than one weapon.") (emphasis added); *id.* at 12 ("[B]ased on experience and witnessing a lot of times, when inmates with weapons like this decide that they want to attack another individual, they have an accomplice with them . . ."). In short, the officers had fair concerns about whom the weapon belonged to, but there was no reasonable basis for pre-warning questioning under the confines of *Quarles* and *Williams*. Lt. Hardin also, despite protestations to the contrary, undoubtedly had prosecution on his mind. The Lieutenant concluded the questioning of Landor by advising Defendant that he would refer the matter to the FBI. *See id.* at 44.[6]

---

[5]

Proof as to the strength of this general suspicion varied. Lt. Hardin described other weapons as "very possible." *See* DE #33 (Tr. I) at 11. SIA Huff characterized other weapons as "definitely a possibility." *See id.* at 141.

[6]

Per SIA Huff, any weapon finding yields a referral to the FBI, and Lt. Hardin would have

The *Quarles* exception does not apply, and the statements to Lt. Hardin are inadmissible as secured in violation of *Miranda*.

## IV. Psychiatrist/Patient Privilege

Defendant also seeks to suppress statements he made to Dr. Willard and Dr. Reinwald as protected by the federal psychotherapist-patient privilege. *See* DE #48 (Defendant Brief II). The United States counters that the privilege is not applicable because Defendant's statements were neither confidential nor made in the course of treatment. *See* DE #46 (U.S. Brief II). Based on an examination of Landor's conversation with Dr. Willard and Dr. Reinwald, within the confines of relevant Sixth Circuit precedent, the Court finds that the privilege applies and blocks use of Defendant's statements.

The Federal Rules of Evidence establish that "the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." *See* FED. R. EVID. 501. The United States Supreme Court, per Rule 501, recognizes a psychotherapist-patient privilege. *See Jaffee v. Redmond*, 116 S. Ct. 1923, 1931 (1996). Specifically, "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure . . ." *See id.* The Supreme Court based its holding on a combination of the significant private interest in effective psychotherapy, the significant public interest in the "mental health of our citizenry," and the modest evidentiary benefit of denying a psychotherapist-patient privilege. *See id.* at 1928-29.

More than a decade before the Supreme Court's decision in *Jaffee*, the Sixth Circuit

_____

known that rule. *See* DE #33 (Tr. I) at 156.

recognized a psychotherapist-patient privilege. *See In re Zuniga*, 714 F.2d 632, 639 (6th Cir. 1983) (finding that patient and societal interests promoted by a psychotherapist-patient privilege "outweigh the need for evidence in the administration of criminal justice" and concluding that "a psychotherapist-patient privilege is mandated by 'reason and experience'"). However, the Sixth Circuit's characterization of the privilege left its scope to be determined on a "case-by-case . . . balancing [of] the interests protected by shielding the evidence sought with those advanced by disclosure." *See id.* at 639-40. In the *Jaffee* decision, the Supreme Court rejected any balancing component because "[m]aking the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege." *See Jaffee*, 116 S. Ct. at 1932; *United States v. Hayes*, 227 F.3d 578, 582 (6th Cir. 2000) (noting the rejection of a balancing test in *Jaffee*).

Despite its rejection of a balancing test to determine the scope of the psychotherapist-patient privilege, the Supreme Court indicated that the privilege is not absolute. In a footnote at the end of its opinion, the Court included the following dicta:

> Although it would be premature to speculate about most future developments in the federal psychotherapist privilege, we do not doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of disclosure by the therapist.

*See Jaffee*, 116 S. Ct. at 1932 n.19. Some circuits have referenced this language to support denial of privilege in cases that involve dangerous or threatening patients. *See, e.g., United States v. Auster*, 517 F.3d 312, 315 n.5 (5th Cir. 2008) ("[T]he foregoing footnote demonstrates that the Court viewed the privilege as limited in scope. Moreover, because the Court contemplated that the privilege must give way in some instances involving dangerous patients, it follows a fortiori that the

14

privilege is inapplicable in similar situations involving dangerous patients where there is no confidentiality."); *United States v. Glass*, 133 F.3d 1356, 1360 (10th Cir. 1998) (characterizing footnote 19 in *Jaffee* as an exception that applies when "the threat was serious when it was uttered and . . . its disclosure was the only means of averting harm . . . when the disclosure was made").

By contrast, the Sixth Circuit clearly has rejected a "dangerous patient" exception to the psychotherapist-patient privilege. *See Hayes*, 227 F.3d at 586. In this decision, the Court emphasized the analytical distinction between a psychotherapist's *ethical* duty to warn and the applicability of the psychotherapist-patient *evidentiary* privilege. *See id.* at 583-85. Ultimately, the Court assessed the *Jaffee* language not in terms of privilege, but rather in terms of the duty to warn:

> We believe, therefore, that the *Jaffee* footnote is no more than an aside by Justice Stevens to the effect that the federal psychotherapist/patient privilege will not operate to impede a psychotherapist's compliance with the professional duty to protect identifiable third parties from serious threats of harm. We think the *Jaffee* footnote was referring to the fact that psychotherapists will sometimes need to testify in court proceedings, such as those for the involuntary commitment of a patient, to comply with their 'duty to protect' the patient or identifiable third parties.

*See id.* at 585. Thus, a psychotherapist perhaps can (or must) reveal information necessary to prevent harm to identifiable third parties but cannot *testify* as to that same information in a criminal prosecution. *See id.* at 586 ("[C]ompliance with the professional duty to protect does not imply a duty to testify against a patient in criminal proceedings or in civil proceedings other than directly related to the patient's involuntary hospitalization, and such testimony is privileged and inadmissible if a patient properly asserts the psychotherapist/patient privilege.").

The *Hayes* analysis applies to the facts and circumstances of Landor's conversation with Dr. Willard and Dr. Reinwald. To reiterate, the *Jaffee* privilege protects confidential statements made to licensed psychotherapists in the course of diagnosis and treatment. *See id.* at 581-82 (quoting *Jaffee*, 116 S. Ct. at 1931). Dr. Willard is licensed in North Carolina, and Dr. Reinwald, while not

licensed, does not engage in any practice that would alert inmates to question his qualifications or licensure; thus, the first requirement is satisfied.[7]  *See* DE #33 (Tr. I) at 91 (Willard); DE #45 (Tr. II) at 53-54 (Reinwald); *Hayes*, 227 F.3d at 587 (employing privilege even though social worker was not licensed because "[t]here [was] . . . no evidence that Hayes was aware that Van Dyke lacked professional qualifications").

Additionally, the conversation between Defendant and the two psychologists was confidential.  Even though the communication occurred at the holding cell in the SHU, the record indicates that the participants considered it to be a private conversation.  *See* DE #33 (Tr. I) at 92; DE #45 (Tr. II) at 55-56 (Reinwald agreeing meeting was intended to be private and was as "private as you could [be] in the setting").  Moreover, Landor did not waive confidentiality by making his statement regarding the knife and his homicidal intent.  Per Dr. Willard and Dr. Reinwald, Defendant previously had received psychological treatment or BOP orientation wherein he would have, in theory, received a warning regarding the limits of confidentiality.  However, those warnings never informed Landor that a treating psychologist could *testify* against him in a criminal proceeding.  *See* DE #33 (Tr. I) at 95 (Willard stating that the inmates are informed "that if they disclose anything about hurting themselves, someone else, or they disclose anything that could compromise the security of the institution, we will report that"); DE #44 (Exhibit & Witness List) (Defense Exhibit #3) at 24 (presenting Chapter 2, page 4 of Administration and Management of Psychology Services, a directive for the Federal Bureau of Prisons).  Therefore, Landor did not constructively waive confidentiality.  *See Hayes*, 227 F.3d at 587.  That is, *Hayes* held that notice

---

[7]

The parties do not contest the licensure requirement.  *See Hayes*, 227 F.3d at 587 (discussing patient's perception of licensure as key).

of a duty to report – which is all the BOP would have communicated to Landor – is qualitatively distinct from notice that a counselor could testify adversely to a patient. *See id.* at 586 ("It is one thing to inform a patient of the 'duty to protect'; it is quite another to advise a patient that his 'trusted' confidant may one day assist in procuring his conviction and incarceration.").

The United States argues that Landor's statement was not confidential because it was made in the common area rather than a private room and because Defendant had received a previous warning regarding the limits of confidentiality. Moreover, the United States urges the Court to disregard the waiver analysis in *Hayes*. The Court disagrees with the United States's characterization of *Hayes* and declines the invitation to resist Sixth Circuit precedent. The Court in *Hayes* spent a significant part of its opinion detailing the distinct analyses and underlying rationales of the duty to warn and psychotherapist-patient privilege. In so doing, the Court implicitly found that disclosure to prevent harm to an identifiable third party does not defeat confidentiality vis-a-vis the testimonial privilege. Because confidentiality remained intact, the Court logically moved on to the waiver analysis. Thus, the Court found that advice encompassing a duty to warn third parties failed to apprise the patient that the social worker could also testify adversely in a criminal proceeding. *See Hayes*, 227 F.3d at 587. No valid waiver occurred, and a patient so warned retained the reasonable expectation of confidentiality. *See id.* at 586. That is just the scenario here.

This case also presents a difference in professional opinion regarding disclosure duties, which the Court in *Hayes* singled out and rejected. *See id.* at 584. Dr. Willard testified that she would disclose "any criminal activity, if it compromises the secure and orderly running of the institution." *See* DE #33 (Tr. I ) at 67. Dr. Willard estimated that in the ten months she has worked at USP McCreary, she has disclosed information to SIS "five to 10 times." *See id.* at 68. By

17

contrast, Dr. Reinwald testified that he has a duty to disclose criminal activity if it is "serious activity." *See id.* at 117. He then estimated that during his tenure of two years and nine months, he had made such disclosures "[m]aybe three or four [times]" or less. *See id.* These differing interpretations of the duty to warn are the precise ill that the Sixth Circuit targeted in *Hayes*. *See Hayes*, 227 F.3d at 584 ("[W]e think it would be rather perverse and unjust to condition the freedom of individuals on the competency of a treating psychotherapist. Moreover, it cannot be the case that the scope of a federal testimonial privilege should vary depending upon state determinations of what constitutes 'reasonable' professional conduct.").

Because the facts of this case are indistinguishable, *Hayes* controls. *Hayes* unquestionably deems otherwise protected statements as remaining confidential *even if* the therapist informs the patient of a duty to warn. According to the record, neither Dr. Willard, Dr. Reinwald, nor the BOP ever advised Landor that adverse testimony, in a criminal prosecution, could result from a statement in therapy. *See* DE #33 (Tr. I) at 95-96 (Willard); *id.* at 109-110 (Reinwald); DE #45 (Tr. II) at 17 (Willard). The United States cites to *United States v. Auster*, 517 F.3d 312 (5th Cir. 2008), and seeks to rely on that decision, but *Auster* criticizes *Hayes* as to this very issue. *See Auster*, 517 F.3d at 317. *Hayes*, a decision from this Circuit, controls over *Auster*, from the Fifth Circuit.

Finally, Landor's statements were made in the course of diagnosis or treatment. *See, e.g., United States v. Hardy*, 640 F. Supp. 2d 75, 78-79 (D. Me. 2009) (finding that threatening statements made to mental health professionals prior to and following involuntary commitment were made in the course of diagnosis and treatment and rejecting as "too narrow[]" the government's argument that "only statements made for the purpose of diagnosis are protected"). The record shows that Defendant, upon incarceration in the SHU, requested to see a member of the psychology staff. When Dr. Willard and Dr. Reinwald approached Landor in the SHU, their professed purpose was

18

to address a mental health need. *See* DE #33 (Tr. I) at 65-66; *id.* at 81; *id.* at 108-109. Dr. Reinwald described Landor as "angry," *see id.* at 129, "pretty upset," *see* DE #45 (Tr. II) at 49, and "agitated," *see* DE #33 (Tr. I) at 129, and Dr. Willard opined that it is common for inmates sent to the SHU to request help from psychology. *See id.* at 80. The United States counters by emphasizing that neither Dr. Willard nor Dr. Reinwald prescribed any coping mechanisms or further treatment options for Landor following their encounter. Additionally, the United States references testimony from the two psychologists indicating that some inmates request to see a psychologist for non-therapeutic reasons. *See* DE #45 (Tr. II) at 7 ("They might want to try to see if they can get a phone call, or tell me they haven't been able to talk to their case manager, or they need to talk to the warden . . ."); *id.* at 50 (noting that inmates attempt to secure phone calls, single cells, or transfer to another unit); *id.* at 68 (another reference to phone call requests).

The Court does not lightly make the factual finding that the statements to Dr. Willard and Dr. Reinwald were made in the course of diagnosis or treatment. After all, the psychologists denied at the last hearing that the interaction was therapeutic. Each carefully, but not credibly, walked a line between the purposes of a psychiatric consult and the specific interaction on that day.

Interestingly, during the initial hearing, both psychologists stressed the treatment (versus investigative) role they played on the date in question. Dr. Willard approached the meeting assuming Landor wanted mental health treatment. *See* DE #33 (Tr. I) at 66; *id.* at 81 ("My purpose was to help him . . ."). Dr. Reinwald agreed that his "central focus" at the institution is the inmate's "mental well-being." *See id.* at 109. In initial briefing, the United States conceded that Landor "requested their [Willard and Reinwald's] assistance" and characterized the psychologists' function as "to treat the mental health of the inmates." *See* DE #14 (U.S. Response to DE ## 9 & 11) at 5-6. Specifically, per the Government: "Defendant was upset because he had been placed in the [SHU]

19

and feared he was going to get disciplined for the matter. This led to the psychologists discussing the reasons he was placed in [the SHU], which led to the incriminating disclosures . . ." *See id.* at 6. At the later hearing, both doctors substantially retreated from these characterizations and foreswore any treatment function.

With all due respect, however, the Court determines that Landor's statements plainly occurred in a diagnostic or treatment milieu. The rough setting and stressful environs must inform the analysis. Landor had just been arrested and placed in the SHU after location of a dangerous weapon in his cell. He also had just been questioned in violation of *Miranda*. That questioning elicited incriminating statements and Lt. Hardin's promise to refer the matter to the FBI. In that context, Landor specifically requested to see someone from the psychology department.

Landor had a treatment history with both Dr. Reinwald and Dr. Willard. *See* DE #33 (Tr. I) at 82-85 (Willard testifying that she had spoken with Landor in her professional capacity prior to January 6, 2009, but had not "significantly" worked with him); *id.* at 124 (Reinwald recalling knowledge of Landor's Axis II diagnosis and medication); DE #45 (Tr. II) at 17 (Willard noting she had prior interactions with Landor); *id.* at 51 (Reinwald generally alluding to Landor's "behavioral issues"); *id.* at 58-59 (same). The psychology department was in charge of Landor's behavior management plan, *see id.* at 59-60, managed his medications, *see id.* at 58-59, and had consulted with Landor previously. Each doctor knew Landor. Defendant – upset, angry, agitated – asked to speak with psychology, and he proceeded to inform the psychologists a) why he was in the SHU and b) why he was so upset. The doctors carry plain skepticism about Landor's version and report (focusing on a sexual claim against staff), but the privilege depends on the purpose, not veracity, of the communication. If Landor initiated conduct with psychology because he was upset and wanted to discuss his situation with a psychologist, which is exactly what happened, the communications

20

were made in the course of treatment or diagnosis.

Dr. Willard's testimony, on the whole, plainly supports the finding. She agreed that the interaction with Landor qualified under one of the described "routine mental health services" categories described in Chapter 4 of the BOP's Psychology Services Manual. *See* DE #44 (Exhibit & Witness List) (Defense Exhibit #3). Under cross-examination, Dr. Willard placed the interaction either under Section 4.2, "Review of Inmates in Segregation," or Section 4.3, "Direct Clinical Services to Inmates." *See* DE #45 (Tr. II) at 33. She further agreed that Landor's request for a psychology meeting in the context – upset and placed in the SHU – would properly be classified as a "crisis intervention" as depicted in the Manual. *See id.* at 34-35. Dr. Willard squarely placed the scenario – an upset inmate wanting to "discuss the reasons for being upset with psych staff" – as "part of the overall treatment role" of a USP psychologist. *See id.* at 35.

There are factors contrary to a finding that the communications were consultative. As the United States argues, the location and duration of the discussion, and the counselors' lack of treatment recommendations or diagnostic follow-up, cut against the privilege. However, the Court has difficulty accepting that two prison psychologists, learning that an inmate 1) had a dangerous weapon; 2) expressed an intent to kill a staff member with that weapon; and 3) alleged a precipitating sexual advance by that staff member, would not receive that information as calling for some level of, at least, psychological or counseling assessment. Landor initiated the contact, and the Court finds that the communications to the psychologists, in that context, were in the course of diagnosis or treatment.

Additionally, the decision cited by the United States – *United States v. Romo*, 413 F.3d 1044 (9th Cir. 2005) – does not persuade the Court. In *Romo*, the 9th Circuit upheld the denial of privilege where an inmate, during a requested meeting with a specific professional counselor,

confessed to writing and mailing a "threatening letter" to the President of the United States. *See Romo*, 413 F.3d at 1045-46. Unlike Dr. Willard and Dr. Reinwald, the counselor in *Romo* wore many institutional hats. Holding the title of Program Director, the counselor's job included "providing inmates with psychological counseling and a host of other duties, ranging from arranging social events to providing classes and acting as a case manager." *See id.* at 1045. In fact, the 9th Circuit expressly emphasized these diverse roles as "bolster[ing] the . . . conclusion that [the counselor] did not provide mental health care during the meeting at issue." *See id.* at 1049; *id.* ("[H]e sometimes provided counseling, but the purpose of the encounters varied from visit to visit. This variety of duties precludes an assumption that [the counselor's] meeting with Romo was a psychotherapy session . . ."). Such a variety of roles is absent in Landor's case. Both Dr. Willard and Dr. Reinwald are staff psychologists tasked with addressing the mental health needs of inmates at USP McCreary. Even though both psychologists alluded to instances of inmates making non-therapeutic requests, the testimony characterized the prison population generally and did not include any specific reference to Landor. Despite the psychologists' purported suspicions of manipulative motives, *see* DE #45 (Tr. II) at 49, Landor did not make any non-therapeutic request. *See id.* at 71-72. Rather, he communicated his situation, which was causing him to exhibit observable signs of anger, agitation, and anxiety. Thus, unlike in *Romo*, the record here contains strong evidence that Landor was seeking therapeutic interaction. *See Romo*, 413 F.3d at 1049 (noting the lack of "*any* evidence suggesting that the session was related to therapy or diagnosis") (emphasis original). The psychologists may not have viewed Landor as warranting treatment, but he sought the interaction under anxiety, and his communications to Dr. Willard and Dr. Reinwald surely fell within the extant relationship between psychologist and patient.

      To conclude, Landor's statements to Dr. Willard and Dr. Reinwald are protected under the

psychotherapist-patient privilege.

## V. Recommendation

For the reasons discussed herein, the Court recommends the following:

1) that the District Court GRANT Defendant Landor's motion to suppress statements made to Lt. Hardin, per a *Miranda* violation; and

2) that the District Court GRANT Defendant Landor's motion to suppress statements made to Dr. Willard and Dr. Reinwald as matters protected by the psychiatrist/patient privilege.

Relatedly, the Court ORDERS the Clerk to indicate on the docket that Defendant's initial motions to suppress (DE #9 and DE #11) are withdrawn at his request, per DE #22.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute. As defined by § 636(b)(1) and Federal Rule of Criminal Procedure 59(b), within ten days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for de novo consideration by the District Court. The parties should consult the aforementioned statute and rule for specific appeal rights and mechanics. Failure to object in accordance with Rule 59(b) waives a party's right to review.

This the 17th day of November, 2009.

Signed By:

**Robert E. Wier**

United States Magistrate Judge